UNITED STATES of America, Appellee,

v.

Martin  G.  THUNA,
Defendant, Appellant.

No.  85–1422.

United States Court of Appeals,
First Circuit.

Argued Dec. 4, 1985.

Decided March 18, 1986.

Alberto Tellechea, Orlando, Fla., with whom Law Offices of Francisco M. Lopez-Romo, San Juan, P.R., was on brief, for defendant, appellant.

Ricardo R. Pesquera, Asst. U.S. Atty., with whom Jose A. Quiles, Acting U.S. Atty., Hato Rey, P.R., was on brief, for appellee.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

Martin G. Thuna appeals from his conviction for the possession and interstate transportation of stolen goods. Thuna contends that the district court committed reversible errors, including: (a) redacting a statement given by Thuna to an FBI agent, and refusing to allow him to cross-examine the agent on the deleted material; (b) failing to exclude prosecution evidence that Thuna claims should have been, but was not, shown to him earlier; (c) admitting the testimony of Dennis Bolton, a printer, although Bolton's testimony was irrelevant and was improper rebuttal; and (d) giving instructions that eased the government's burden of proof on the issue of appellant's state of mind. Since we do not find merit in any of these arguments, we affirm.

I.

The evidence at trial tended to establish the following:

Martin Thuna was the president of Farmedics, Inc., a California pharmaceutical and health products distributor. He was also the president of two companies in Puerto Rico, Drogueria Save-On and Drogueria Isla, which purchased most of the merchandise subsequently distributed by Farmedics.

On July 30, 1982, a container loaded with 2,805 cartons of Tic Tac candies was stolen from Ferrero, Inc., a Tic Tac distributor based in Puerto Rico.[1] Four days later, while on a business trip to Puerto Rico, Thuna phoned the executive vice president of Farmedics, Jose Ferrer, to determine if Farmedics could sell some Tic Tacs. After quickly checking with some California distributors, Ferrer reported to Thuna that Farmedics would be able to sell the candy.

A distributor Ferrer contacted spoke to others, one of whom wrote down the information he received about the Tic Tacs. His figures on the quantity and flavors available, relayed to him by this distributor who had been contacted by Ferrer, exactly matched the quantity and flavors of the stolen shipment of Tic Tacs as recorded on the bill of lading pasted to one of the stolen cartons. According to the government, this suggested that Thuna had a copy of the bill of lading in front of him when he contacted Ferrer. If Thuna did have the bill of lading, he certainly would have known that the Tic Tacs were stolen, since that document listed the intended recipient of the shipment.

After he heard that it would be possible to sell the Tic Tacs, Thuna instructed Felix Vasquez, an accountant for Drogueria Save-On, to prepare ten checks for $5,000 each, payable to fictitious names. Thuna then purchased the load of stolen Tic Tacs for $50,000, and shipped it to Farmedics on August 4. Farmedics promptly sold the Tic Tacs to James Miller, a distributor.

---

1. Ferrero, Inc., receives Tic Tac candy from Italy, packages it in Puerto Rico, and ships it both to Ferrero U.S.A., a New Jersey-based distributor, and to a Canadian distributor.

Several weeks later, Miller received some inquiries as to whether the Tic Tacs he had distributed were legitimate. Miller called Ferrer, who stated that the Tic Tacs were not stolen and that documentation was available. Miller subsequently returned approximately 1,262 cartons of the candy that he was unable to sell. Farmedics then sold the returned candy to Peninsula Brokerage, which sold them to Opportunity Sales.

Over the next several weeks, Opportunity received information from various sources that the candy it had purchased might have been stolen. Opportunity reported this information to Peninsula, which promptly made inquiries to Farmedics. Farmedics representatives, including Thuna himself, gave assurances that the candy was not stolen. Despite the repeated inquiries, Farmedics made no effort to check with Ferrero U.S.A., the American distributor of Tic Tacs, to determine the legality of the shipment. Eventually, Opportunity contacted the FBI, the Marshals Service, and Ferrero U.S.A. After checking the production code numbers on the candy, Ferrero determined that the Tic Tacs being sold by Opportunity were from the stolen load, and purchased the remaining 370 cases in Opportunity's stock.

Felix Vasquez, the accountant for Drogueria Save-On, testified that about a month and a half after the original purchase in Puerto Rico (soon after the initial inquiries regarding the legality of the Tic Tacs were made), Thuna delivered to him an invoice bearing the name of E & M Distributors purportedly documenting the purchase of 1,380 cases of Tic Tacs. Thuna instructed Vasquez to enter the invoice amount into accounts payable. In addition, Vasquez testified that on January 17, 1983,

after Ferrero had determined that the Tic Tacs were stolen, Thuna requested that the accountant return to him the ten cancelled checks, made out to fictitious names, that had reportedly been used to pay for the Tic Tacs.

On January 28, 1983, FBI Agent William Stovall went to the California offices of Farmedics to interview Thuna about the stolen Tic Tacs. Thuna presented the invoice showing that he had purchased the candy from E & M Distributors, and said that he had done business with E & M before. At trial, however, the government presented evidence that the address given on the E & M invoice does not exist; that of the two telephone numbers listed, one belonged to a gas station and the other to a private individual; and that the company was not incorporated in Puerto Rico.

Thuna also told the FBI agent that the Tic Tacs he purchased from E & M were sold directly to Peninsula Brokerage. He failed to mention the original sale to Miller and Miller's subsequent return of the unsold candy, nor did he reveal that he had received inquiries as to the legitimacy of the candy.

On September 24, 1984, a federal grand jury returned four-count superseding indictments against Thuna and Juan Ortiz Negron and a two-count indictment against Alfonso Rivera Mercado for their roles in possessing and transporting the stolen load of Tic Tacs.[2] Trial by jury began on March 11, 1985. At the close of the government's case, all three defendants moved for judgment of acquittal pursuant to Fed.R. Crim.P. 29. Thuna's motion was granted on the two conspiracy counts, but was denied on the remaining two counts.[3]

---

**2.** The indictments charged Thuna and Ortiz with (1) conspiracy to possess goods of a value in excess of $100 that had been stolen in interstate commerce, 18 U.S.C. §§ 659 and 371; (2) possession, or aiding and abetting the possession, of such goods, 18 U.S.C. §§ 659 and 2; (3) conspiracy to transport in interstate commerce stolen goods of a value in excess of $5,000, 18 U.S.C. §§ 2314 and 371; and (4) interstate transportation, or aiding and abetting the interstate

transportation, of such goods, 18 U.S.C. §§ 2314 and 2. Rivera was charged with the first two of these counts.

**3.** Ortiz's motion was granted on all four counts, and Rivera's motion was granted on the conspiracy count. The jury acquitted Rivera on the remaining count.

On March 25, 1985, the jury returned a verdict finding Thuna guilty of possession of goods known to be stolen and having a value in excess of $100, and of interstate transportation of goods known to be stolen and having a value in excess of $5,000. The court sentenced Thuna to eight years on each count, the sentences to run concurrently. Thuna appealed.

## II.

After his January 28, 1983 meeting with Thuna in California, FBI Agent Stovall prepared a "302 Report" summarizing what Thuna had told him. Part of the 302 Report appears to refer to the manner in which Thuna came to know of the load of Tic Tacs. It reads in part,

> In this particular instance, he [Thuna] remembered an individual coming to his office there [in Puerto Rico] and speaking with the office manager, Juan Ortiz. Thuna advised he contacted his salesman, Jose Ferar [sic], in the U.S. and asked him if he thought they could sell these items.[4]

Prior to the trial, co-defendant Juan Ortiz moved for redaction of Thuna's statement. Ortiz contended that the reference implicating him was hearsay, and impermissibly violated his sixth amendment rights because the declarant, Thuna, was not subject to cross-examination.[5] The district court, relying on *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), granted Ortiz's motion and ordered the sanitation of Thuna's statement by deleting the words "there and speaking with the office manager, Juan Ortiz." Subsequently, upon motion of co-defendant Rivera, the court ordered the deletion of the entire sentence ("In this particular instance he remembered an individual coming to his

---

4. The full 302 Report reads as follows:

Martin G. Thuna, President, Farmedics, Inc., 21020 Superior Street, Chatsworth, California, telephone 709–3713, was advised of the identity of the interviewing agent and that the purpose of his interview concerned a sale of Tic Tacs made by his company to another company in the Los Angeles area. Also present during the interview was a salesman, Jose Ferar [sic]. Thuna advised as follows:

He recalled his company's purchase of Tic Tacs in Puerto Rico and requested that paperwork be obtained to cover this purchase. He advised that in July and August 1982, he was in Puerto Rico. His company also operates in Puerto Rico under the name of Drugueria Savon [sic], 1322 Jesus Pinero Caparra Terrace, Puerto Rico. His company purchases presciption-type [sic] medications and other items to be sold in pharmacies and ships them to the U.S. for sale. He advised that they do not normally purchase candy or food items; most of his items are controlled substances. *In this particular instance, he remembered an individual coming to his office there and speaking with the office manager, Juan Ortiz.* Thuna advised he contacted his salesman, Jose Ferar [sic], in the U.S. and asked him if he thought they could sell these items. At that time, Ferar [sic] advised he telephoned around and contacted Paul P. Lawson, of Hilton-Tjaden-Brown, 11643 Telegraph, Santa Fe Springs, California, 949–0500, and asked them if he could use the Tic Tacs. Lawson in turn, referred him to Victor Trutanich, of Gibbs, McCormick, Trutanich Food Brokerage, 613 West Ninth Street, San Pedro, California. They sold the total amount received in the U.S. to Trutanich.

Thuna then furnished an invoice dated August 3, 1982 from E & M Distributors, Inc., Calle Guayama 863, Hatorey [sic], Puerto Rico. This invoice reflects that Farmedics purchased 1,380 cases of assorted Tic Tacs at $28.00 a case, for a total purchase of $38,-640.00. The vendor indicated on this form appears to be J.C. This invoice also reflects one other purchase of 72 cases of Lifebuoy soap. Thuna also furnished a sales invoice from Farmedics to GMCT, 613 West Ninth Street, San Pedro, California, for 1,244 cases of Tic Tacs. The difference in the number of cases purchased and the number of cases sold by Farmedics in California was brought to the attention of Thuna. He advised they sold all they had received and that probably they had not received the entire amount. Some of the cases of Tic Tacs could have been sold in Puerto Rico. Thuna advised his company had purchased other things from E & M Distributors in the past. Attached are xeroxed copies of the above described sales invoices.
SA William R. Stovall

1/31/83

(Emphasis added.)

5. The district court ruled that Thuna's statement was an admission, and thus admissible as to him. Fed.R.Evid. 801(d)(2). As against co-defendants Ortiz and Rivera, however, the statement (as told to and reported by Agent Stovall) was inadmissible hearsay.

office there and speaking with the officer manager, Juan Ortiz.").[6]

Thuna objected to leaving out the sentence on the ground that it would create a misleading impression as to his role in the transaction. He argued that the relative roles played by each co-defendant bore heavily on the issue of his knowledge. Thuna also strenuously objected to the court's accompanying order that counsel refrain from examining Agent Stovall at trial in such a way as to bring out the deleted material. On appeal Thuna argues that the court's failure to pay heed to his objections was prejudicial to his defense and violated his sixth amendment right to cross-examination.

■ Thuna never moved formally to sever the trial of his case from that of the co-defendants. *Contrast United States v. Gonzales,* 749 F.2d 1329 (9th Cir.1984); *State v. Barnett,* 53 N.J. 559, 252 A.2d 33 (1969); *People v. LaBelle,* 18 N.Y.2d 405, 276 N.Y.S.2d 105, 222 N.E.2d 727 (1966); *cf. United States v. Meacham,* 626 F.2d 503, 510–12 (5th Cir.1980). If the co-defendants had not been tried with him, of course, his whole statement could have come in. But even without having formally taken such an initiative, Thuna was entitled to object to use of any truncated version of his statement that significantly distorted the statement's original tenor in a way prejudicial to him. A court may not recast admissible evidence so as to create a materially false impression that is harmful to the interest of one of the parties.[7]

Thuna argues that the redaction of his statement was harmful in that it distorted the nature of his testimony, "giving the jury the impression that Thuna purchased the Tic Tacs from a company known as E & M Distributors and eliminating Thuna's explanation as to how the existence of the Tic Tacs became known to him."

The record indicates, however, that it was testimony, rather than any negative inferences drawn from the redaction or limitation on cross-examination, that created any "impression that Thuna purchased the Tic Tacs from a company known as E & M Distributors."[8] Agent Stovall testified that Thuna stated at their January 28 meeting that he, Thuna, had purchased the Tic Tacs from E & M Distributors, and that he had done business with E & M before.[9] Thuna was free to cross-examine Stovall regarding anything Thuna reportedly said about E & M and his purported prior dealings with that company, as long as his cross-examination did not bring out the deleted sentence.

To be sure, had the deleted sentence been left in, Thuna's counsel might have argued that because Thuna only "remembered an individual coming to his office there and speaking with the office manag-

6. According to the government, Rivera was the "individual" referred to in the deleted sentence.

7. In objecting to redaction below, Thuna referred to Fed.R.Evid. 106, the "rule of completeness," though he does not do so on appeal. Even assuming it is relevant, it is clear that application of rule 106 is left to the sound discretion of the district court. *See United States v. Dorrell,* 758 F.2d 427, 434–35 (9th Cir.1985); *United States v. Soures,* 736 F.2d 87, 91 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 914, 83 L.Ed.2d 927 (1985). In reviewing the exercise of the trial court's discretion, we would place heavy emphasis on the possible prejudice to Thuna. *See United States v. Kaminski,* 692 F.2d 505, 522 (8th Cir.1982) ("The rule of completeness is violated, and severance required, only where admission of the [redacted] statement in its edited form distorts the meaning of the statement or excludes information substantially exculpatory of the declarant."); *United*

*States v. Marin,* 669 F.2d 73, 84–85 (2d Cir. 1982). Since, as we discuss below, Thuna was not prejudiced by the redaction, we would find no abuse of discretion if the rule were an issue on appeal.

8. E & M Distributors is also mentioned at the end of the statement given to Stovall. *See* note 4, *supra.*

9. Appellant appears to claim that the district court ordered Agent Stovall to *change* his testimony by replacing the deleted sentence with "Yes, he [Thuna] told me that he got [the Tic Tacs] from E & M Distributors." We read the record quite differently. The district court was simply instructing Stovall to avoid repeating so much of Thuna's statement as inculpated Ortiz and Rivera. In testifying that Thuna said he had purchased the candy from E & M, Stovall was merely restating what he had said earlier during direct examination.

er, Juan Ortiz," he himself was only peripherally involved. But this is scarcely much of an argument in the circumstances of this case. Thuna and Ortiz shared an office in Puerto Rico at the time of the purchase. In the deleted sentence itself, Thuna admits to remembering the contact between "an individual" and Ortiz. In the next sentence, Thuna speaks of himself contacting his salesman, Ferrer, in the United States and asking if he thought they could sell the product. It is hard to see how the sanitized version is either more or less harmful to Thuna than the complete one. It was not important whether or not Thuna alone dealt directly with the seller. What the government needed to show was that, in purchasing the stolen candy, Thuna had knowledge that it was stolen, and on this issue the deleted sentence had little, if any, bearing. The government sought to prove that Thuna knew that the Tic Tacs were stolen from the following facts evinced at trial, among others: that Thuna claimed to have purchased the Tic Tacs from E & M Distributors, a company he said he had done business with before, when in fact the company did not exist; that prior to his actual possession of the Tic Tacs, Thuna had exact quantity and flavor figures for the shipment, suggesting that he may have had a copy of the bill of lading; that Thuna sought to purchase the candy by using ten checks for $5,000 each, made out to fictitious names; that he gave assurances to purchasers that the shipment was not stolen without ever calling the distributor of the Tic Tacs to determine if they were in fact stolen; that he did not provide his accountant with documentation of the purchase until after he received inquiries regarding the legitimacy of the candy; and that he failed to give Agent Stovall accu-

rate information about the path of the Tic Tacs after the purchase by Farmedics.

The redacted sentence does not reduce the strength of the resulting inferences. As the district court stated in a pretrial order, "the deleted portion is not an exculpatory statement, nor is it a statement that tends to show that someone else committed a crime rather than the declarant." At most, the statement served to demonstrate that Ortiz (as well as Thuna) was aware that the candy was stolen; it did not tend to lessen any likelihood that Thuna himself knew the stolen nature of the goods.

■■■ Nor would the deletion cause confusion regarding the ownership of E & M, as Thuna contends. The government presented substantial evidence that E & M Distributors does not exist, and Thuna was free to challenge any of this evidence. In sum, the deletion of the sentence, and the limitation upon cross-examination of Agent Stovall that necessarily accompanied it,[10] did not make the statement misleading in respect to its author, Thuna. We, therefore, find no prejudice to Thuna.

Thuna also maintains that redaction of the statement prevented him from taking the stand. We are unpersuaded by this argument. Had Thuna testified, the *Bruton* problem would have vanished, since there would no longer have been a hearsay problem vis-a-vis Ortiz and Rivera. *See Nelson v. O'Neil*, 402 U.S. 622, 627, 91 S.Ct. 1723, 1726, 29 L.Ed.2d 222 (1971) ("The Constitution as construed in *Bruton*, in other words, is violated *only* where the out-of-court hearsay statement is that of a declarant who is unavailable at the trial for 'full and effective' cross-examination."). Any concerns Thuna may have had lest his testimony regarding the roles of Ortiz and

---

10. Thuna's statement was admitted solely through the testimony of Agent Stovall. Therefore, it was necessary to restrict examination of Stovall—both on direct and cross-examination—in order to effectively keep out Thuna's inculpation of Ortiz and Rivera. Since the deletion of the sentence was not prejudicial to Thuna, it was within the district court's discretion to so limit cross-examination, and no independent sixth amendment issue is raised. We note, how-

ever, that even if the denial had been upon a proper and material subject for cross-examination, the denial would have been harmless. *See United States v. Brown*, 603 F.2d 1022, 1026-27 (1st Cir.1979); *United States v. Honneus*, 508 F.2d 566, 572 (1st Cir.1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975); *Wheeler v. United States*, 351 F.2d 946, 947 (1st Cir.1965).

Rivera would be in seeming conflict with the redacted statement could easily have been resolved by asking the district court to lift the redaction order and permit the recalling of Agent Stovall to testify to the deleted portion.

### III.

Thuna next contends that the district court erred when it denied his motion to exclude a blank invoice headed "J. Rodriguez, Inc." Thuna argues that this invoice was really part of the prosecution's case-in-chief and, not having been disclosed to defendant prior to trial, should not later have been allowed to be introduced in evidence. Fed.R.Crim.P. 16(a)(1)(C).[11]

The "J. Rodriguez, Inc." blank invoice was offered by the government during its cross-examination of Michael O'Connor, a witness called by Thuna who was the chief financial officer and records custodian for Thuna's companies. During direct examination, O'Connor identified a number of business records that seemingly demonstrated that on January 17, 1983, Thuna was at his Farmedics offices in California. These documents tended to contradict the testimony of Thuna's accountant, Felix Vasquez, that Thuna had been in Puerto Rico on January 17, and while there had ordered Vasquez to return to him the ten cancelled checks used to pay for the stolen Tic Tacs.

On cross-examination O'Connor was shown the "J. Rodriguez, Inc." invoice. He testified that he had seen such invoices before because Farmedics had purchased merchandise from that company. The government then proceeded to show that the J. Rodriguez invoice bore the same fictional address as was on the E & M invoice, and that Jose Ferrer, the Farmedics vice president, had himself arranged to have the J. Rodriguez invoices printed. From this evidence the jury could conclude that the J. Rodriguez invoice had been fabricated. If so, other records of Farmedics, possibly including those documents used to show that Thuna was in California on January 17, might also have been falsified.[12]

■ We cannot say that the district court abused its discretion in admitting the J. Rodriguez invoice, as it was relevant to the weight the jury should give to the documents admitted on direct examination of O'Connor. A trial court has wide discretion in ruling on such matters. As regards compliance with Rule 16, the court could reasonably have found that the invoice was rebuttal, not part of the government's case-in-chief, and that the exhibit was obtained not from the defendant but from a printer, as the government claimed. Thuna does not contend that the invoice would have been material to the preparation of his defense.

■ Rule 16(a)(1)(C) does not require the disclosure of evidence not intended for use by the government in its case-in-chief when the evidence was not obtained from the defendant or by means of a grand jury subpoena and the defendant has failed to show its materiality to the preparation of

---

11. Fed.R.Crim.P. 16(a)(1)(C) provides,
    **(C) Documents and Tangible Objects.** Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of his defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

12. While the government did not fully explain that it was offering the J. Rodriguez invoice in order to impeach the documentary evidence presented through O'Connor, the district court appears to have relied on this rationale, at least in part. In response to strenuous objection to admission of the invoice by Thuna's counsel, the court observed,

    we have been talking about these documents [the J. Rodriguez and E & M Distributors invoices] all the time. Now, we do bring into evidence this witness O'Connor with all the documents he brought into play as to the dates when Thuna was there and other facts that he has testified. I think it is proper rebuttal.

his defense. *United States v. Rhoads*, 617 F.2d 1313, 1319 (8th Cir.1980). Absent an abuse of discretion, we will not disturb a district court's ruling on issues involving discovery under Rule 16. *United States v. Samalot Perez*, 767 F.2d 1, 4 (1st Cir.1985); *United States v. Balk*, 706 F.2d 1056, 1060 (9th Cir.1983).

■ Similarly the district court did not abuse its discretion in permitting the rebuttal testimony of Dennis Bolton, a printer who testified that he had created the J. Rodriguez invoice for Farmedics at the request of Jose Ferrer. He stated that Ferrer had ordered only a small number of the invoices, paid cash for them, and paid extra money to have the invoices created within a day. As the introduction of the invoice itself was proper rebuttal, Bolton's testimony regarding how the invoice was created was also proper. In view of the wide latitude properly granted to trial judges in determining whether proposed evidence is proper rebuttal, *see, e.g., United States v. Cepeda Penes*, 577 F.2d 754, 760 (1st Cir. 1978); *United States v. Papia*, 560 F.2d 827, 848–49 (7th Cir.1977), we cannot say the district court abused its discretion in permitting Bolton to testify.

## IV.

Thuna would have us find error in the giving of two jury instructions that, he says, impermissibly relieved the government of its burden of proof on the issue of Thuna's state of mind. Relying on *Francis v. Franklin*, —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), Thuna maintains that the instructions violated Thuna's due process right not to be convicted "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). We find little merit to this argument.

In *Francis*, the Supreme Court found unconstitutional a charge instructing the jury that "[t]he acts of a person of sound mind and discretion are presumed to be the product of a person's will, but the presumption may be rebutted. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but the presumption may be rebutted." *Francis*, —— U.S. at ——, 105 S.Ct. at 1972. The Court found that the instructions were "cast in the language of command." The jurors, said the Court, "were not told that they had a choice, or that they *might* infer that conclusion; they were told only that the law presumed it. It is clear that a reasonable juror could easily have viewed such an instruction as mandatory." *Id., quoting Sandstrom v. Montana*, 442 U.S. 510, 515, 99 S.Ct. 2450, 2454, 61 L.Ed.2d 39 (1979).

■ The instructions in the present case suffered from no similar disability. In quite standard language, they instructed that the unexplained possession of recently stolen property in a state other than the one from which the property is stolen is ordinarily a circumstance from which the jury may reasonably draw the inference and find, in the light of surrounding circumstances shown by the evidence in the case, that the person in possession knew that the property was stolen and transported it in interstate commerce.[13]

A rebuttable presumption, like the one in *Francis*, requires jurors to come to a cer-

---

**13.** Specifically, the district court charged as follows:

■ Possession of property recently stolen, if not satisfactorily explained, is ordinarily a circumstance from which the jury may reasonably draw the inference and find, in the light of surrounding circumstances shown by the evidence in the case, that the person in possession knew the property had been stolen.... Ordinarily, the same inferences may reasonably be drawn from a false explanation of possession of recently stolen property.

■ And possession in one state of property recently stolen in another state, if not satisfactorily explained, is ordinarily a circumstance from which the jury may reasonably draw the inference and find, in the light of surrounding circumstances shown by the evidence in the case, that the person in possession not only knew it to be stolen property, but also transported it, or caused it to be transported.

tain conclusion unless the defendant presents contrary evidence. These instructions, however, were clearly permissive. The court defined the term "inference," and emphasized to the jury that they were never required to make inferences. It further instructed that the burden of proof beyond a reasonable doubt remains with the government throughout the entire trial, and never shifts to the defendant.

Under such circumstances, the instructions given by the district court did not shift any burden of proof on the issue of state of mind to the defendant. *Accord Barnes v. United States*, 412 U.S. 837, 840–46, 93 S.Ct. 2357, 2360–63, 37 L.Ed.2d 380 (1973) (upholding first instruction); *United States v. Lavoie*, 721 F.2d 407, 409–10 (1st Cir.1983), *cert. denied*, 465 U.S. 1069, 104 S.Ct. 1424, 79 L.Ed.2d 749 (1984) (upholding first instruction); *United States v. Andrews*, 675 F.2d 962, 964 (8th Cir. 1982) (upholding both instructions); *McAbee v. United States*, 434 F.2d 361, 361–63 (9th Cir.1970) (upholding both instructions). Where, as here, there was ample evidence for the jury to apply the permissive inferences, we see no reason to disturb the verdict.

*Affirmed.*