**STATE of Maine**

v.

**Dana CRANEY and Willard Eastman.**

Supreme Judicial Court of Maine.

Argued June 21, 1995.
Decided July 20, 1995.

Andrew Ketterer, Atty. Gen., Nancy Torresen (orally), Charles K. Leadbetter, Wayne S. Moss, Asst. Attys. Gen., Augusta, for the State.

David Brandt (orally), Windham, for Dana Craney.

William Cote (orally), Laskoff & Sharon, Lewiston, for Willard Eastman.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

WATHEN, Chief Justice.

Defendants Dana Craney and Willard Eastman appeal from judgments entered in the Superior Court (Androscoggin County, *Alexander, J.*) following jury verdicts finding them guilty of intentional and knowing murder, 17–A M.R.S.A. § 201(1)(A) (1983), and robbery, 17–A § 651(D), (E) (1983). Defendants argue that the court erred by admitting Craney's redacted confession and that prosecutorial misconduct during closing argument deprived them of a fair trial. Defendant Eastman also asserts that the evidence was insufficient to support his conviction. Disagreeing on all points, we affirm the judgments.

On December 20, 1990, the body of Leon Michaud was discovered by two woodsmen in a culvert on a rural road in Auburn. Michaud, an auctioneer who bought and sold used furniture, had been missing since December 17. On May 5, 1993 Dana Craney and Willard Eastman were arrested for the murder of Michaud. Defendant Eastman filed a motion for relief from prejudicial joinder based on statements that would presumably be offered in evidence, implicating both defendants, made by Craney to an Androscoggin County Sheriff's Deputy. After a hearing, the motion was denied and defendants were tried jointly before a jury.

The jury could have found the following facts beyond a reasonable doubt: On December 17, Michaud told someone on the telephone that he had to go to the bank and after that he would come to Goff Street. Before leaving home around 8:30 a.m., he made an appointment to see some furniture in Lewiston between 10:00 and 11:00 a.m. Michaud went to the bank, cashed some checks at 9:11

a.m., and left with $1,450 in fifty and one hundred dollar bills.

On that same morning, Craney, his wife and his friends Eastman and Rod Savage were at the Craneys' apartment at 72 Goff Street. Eastman pulled out a gun and showed it to Savage and Mrs. Craney. Savage thought that the gun looked like a nine millimeter or a .38. About three weeks earlier, Mrs. Craney had heard defendants say they were going to "hit" someone, and on December 17 she heard them say again that they° were going to "do a hit on someone." On December 17, Craney set up an appointment with Michaud. Michaud arrived at the apartment between 9:00 and 10:00 that morning. Michaud, Eastman and Craney left the apartment together. Michaud got into his blue pick-up truck and Eastman and Craney got into Eastman's car, and followed Michaud down Goff Street. Around 10:30 a.m., a truck, fitting the description of Michaud's, was seen speeding down Minot Avenue with a blond man in the passenger's seat, and around 10:45 a.m., Michaud's truck was seen parked at the Shop & Save with a man with dark bushy hair sitting behind the steering wheel. Defendants' hair coloring corresponds with the descriptions.

When Michaud failed to keep his 11 a.m. appointment in Lewiston, his family became worried and began to search for him. Between 3:30 and 4:00 p.m. Michaud's truck was found in the parking lot of Shop & Save. The truck had not been in the parking lot around 3 p.m. and when it was found, it was parked in a different spot than where it had been seen earlier that morning.

On Thursday December 20, two woodsmen found Michaud's body in a culvert on a rural road. On Monday, December 17, as they had been coming back from lunch around 12:30 p.m., the woodsmen had noticed tire tracks and footprints in the snow on the roadside almost directly over the culvert. They had seen a red stain in the snow that would have been right below the passenger's door of a vehicle that had pulled off the road. They had not seen any tracks on their way to lunch on Monday, December 17, at 11:30 a.m. On Wednesday, December 19, when they returned to the woods and passed over the

culvert, they saw a boot laying in the snow but did not stop. Something about the position of the boot bothered one of the men, and the next day they stopped to check it. They found Michaud's body in the culvert and called the police.

Michaud died of multiple bullet wounds. He had been shot at least six times and had died sometime in the late morning of December 17. A .380 caliber bullet was recovered from Michaud's body and a spent .380 bullet casing was found beside the tire tracks near the body. Bullet holes and blood of Michaud's type were found in the truck, along with a piece of paper with "72 Goff Street" written on it.

About an hour and one-half to two hours after defendants left the apartment on December 17, Craney returned by taxi. Craney took some money out of his pocket and showed it to his wife. It was more money than he had when he left the house earlier that morning and Craney told his wife that he had to be careful about spending the proceeds of the "murder." Neither Craney nor his wife were working in December 1990 but, on December 17, Craney paid off a debt with $400 in fifty dollar bills, and made a $200–$300 loan to a friend. In the days after the murder, Craney and his wife talked and argued about the murder. Craney told her that he threw the gun in the Androscoggin River and that the police would never find it. Defendants told her that they had "covered their tracks so well that the cops would never catch up to them."

During a search of Eastman's home, police found a plastic firearms box with a label reading "Star Model S caliber .380." Although a receipt indicated that, on November 30, 1990, Eastman had sold the .380 caliber Star semi-automatic pistol to a John Whitman of 97 Third Street, Auburn, police found no such address or person. A Maine State Police Firearms Examiner determined that the bullets retrieved from Michaud's body, his truck, and the ground near the culvert were all fired from the same gun. He also determined that the class characteristics of the bullets in the Michaud murder were identical to bullets fired from a Star .380 pistol.

Craney made a number of statements to acquaintances concerning the Michaud homicide. In response to an observation that he was going to have to "go down for murder," Craney said "he couldn't go down for the murder if there wasn't no weapon. The weapon had gone for a swim." When asked "Why did you knock off the old man for two grand?" Craney said his rent was due and he had no Christmas gifts for his children. Furthermore, Craney told Savage to tell people that the gun Eastman showed him on December 17 was a .25 caliber rather than a .380. On May 7, 1993, two days after he had been arrested, Craney made statements to an Androscoggin County Sheriff's Deputy that incriminated both himself and Eastman.

Prior to allowing the deputy to take the stand at the trial, the court called a recess to hear the defendants' objections to the admission of her testimony. After conferring with counsel, the court determined that Craney's redacted statements neither directly nor by implication referred to Eastman, and were admissible pursuant to M.R.Evid 105.[1] Eastman refused the court's offer to instruct the jury that they were to consider this testimony only as against Craney and to disregard it in the case against Eastman.

Craney's references to Eastman were expunged and replaced with neutral pronouns and the deputy then testified that Craney told her he wanted to turn state's evidence, that he was glad his wife came forward, but he wished they had done it together sooner and that he had to accept his involvement in the murder and make things right with his family and Michaud's family. The deputy also testified that Craney said he was told that Michaud had been murdered and was given a gun to get rid of, and although he had not seen the body, he knew how it happened. On cross examination the deputy agreed that Craney had told her "someone" told him how the murder happened, and "someone" gave him the gun to get rid of and paid him money to keep quiet and that a Tony LaRouso was involved in the murder and was threatening him. The jury returned

verdicts of guilty against both defendants, and they now appeal.

### Bruton Violation

Defendant Eastman argues that he was denied his Sixth Amendment right to confront the witnesses against him because he was incriminated by the redacted statements, and was unable to cross-examine his codefendant Craney, who did not take the stand. He relies on *Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 1622–23, 20 L.Ed.2d 476 (1968), which held that a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession, naming him as a participant in the crime, is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant. The Court observed that when a defendant is directly implicated by his codefendant, and those "powerfully incriminating" statements are introduced before the jury in a joint trial, the "risk that the jury will not or cannot follow instructions is so great and the consequences of failure so vital to the defendant" that they cannot be ignored. *Id.* at 135, 88 S.Ct. at 1627–28. Defendant urges us to extend the *Bruton* exception to include situations, like this one, when the statement is not incriminating on its face, but becomes so in the context of other evidence introduced at trial. Eastman asserts that Craney's statement that "someone" gave him the gun to get rid of, when viewed in light of the state's effort to tie Eastman to the murder weapon, was powerfully incriminating and represented a violation of his rights under *Bruton*.

■ When a confession is redacted in lieu of granting separate trials, the standard of review on appeal is whether "appellants have made the 'strong showing of prejudice' required to overturn a trial court's decision to proceed with a joint trial." *United States v. Cleveland*, 590 F.2d 24, 28 (1st Cir.1978).

*Bruton* established a narrow exception to the general rule that a properly instructed

---

1. M.R.Evid. 105 provides in pertinent part:
   In a criminal case tried to a jury evidence inadmissible as to one defendant shall not be admitted as to other defendants unless all references to the defendant as to whom it is inadmissible have been effectively deleted.

jury will follow its instructions. *See Richardson v. Marsh,* 481 U.S. 200, 208, 107 S.Ct. 1702, 1707–08, 95 L.Ed.2d 176 (1987). When a codefendant's confession expressly implicates the defendant, there is not the slightest doubt that the confession would prove to be "powerfully incriminating." When a confession is not incriminating on its face, however, and becomes so only when linked with other evidence introduced at trial, it is a less valid generalization that the jury will be likely to disobey the instruction to disregard the evidence. *Id.* The Court in *Richardson,* addressing a confession that had been redacted to eliminate all reference to the existence of the defendant, limited *Bruton* to facially incriminating confessions. The Court observed that, if *Bruton* were extended to confessions incriminating by connection, it would be impossible for a trial court to predict the admissibility of a confession in advance of the trial. *Id.* at 208–09, 107 S.Ct. at 1707–08. The *Richardson* Court, however, expressed no opinion on the admissibility of a confession, like the one in the instant case, when defendant's name has been replaced with a neutral pronoun. *Id.* at 211 n. 5, 107 S.Ct. at 1709 n. 5.

Prior to *Richardson,* we addressed a situation similar to the one in the instant case. In *State v. Wing,* 294 A.2d 418, 419 (Me.1972), one defendant confessed that "he was present when the idea [of robbery] was 'brought up with two other people.'" Although other evidence was introduced that would have allowed the jury to infer that the nonconfessing defendant was one of the "two other people," we held that this statement, introduced in evidence through testimony of the officer to whom it was made, did not represent a *Bruton* violation. *Id.* at 423.

■ Since *Richardson,* there has been a split of authority over the proper analysis of non-testifying codefendant's confessions, when the defendant's name has been replaced with a neutral pronoun. Some jurisdictions have adopted the facial implication doctrine, holding that a redacted confession, in which the names of defendants have been replaced with neutral pronouns, is admissible, provided that "the statement standing alone does not otherwise connect codefend-

ants to the crimes." *See United States v. Williams,* 936 F.2d 698, 700 (2nd Cir.1991). Other jurisdictions have adopted the contextual implication doctrine, holding that a court must consider all of the other evidence introduced at the trial to determine if a substantial risk exists that the jury will consider the codefendant's confession in deciding the guilt of the defendant. *See Foster v. United States,* 548 A.2d 1370 (D.C.App.1988).

In *Wing,* we did not speak specifically of the facial implication doctrine. Our analysis, however, was consistent with that approach. Numerous jurisdictions, including the First Circuit, have subsequently adopted that doctrine. In *United States v. Greenleaf,* 692 F.2d 182, 189 (1st Cir.1982) (Coffin, C.J.) the court dealt with a redacted statement in which the defendant's name was replaced with the pronoun "someone." The court rejected the defendant's argument that the statement should be taken in conjunction with the other evidence, and held that the "statement, standing alone, is not powerfully incriminating ... [and] is simply not enough to satisfy the 'powerfully incriminating' standard of *Bruton.*" *Id.; see also United States v. DiGregorio,* 605 F.2d 1184 (1st Cir.1979) (the fact that a codefendant's admission tended to corroborate the government's case against the defendant is not enough to constitute a *Bruton* violation). In this case, Craney's statements standing alone do not connect Eastman to the crime, and thus do not meet the narrow exception set forth in *Bruton.*

### Rule of Completeness

Defendant Craney contends that the trial court improperly precluded him from introducing portions of his post-arrest statements. Craney concedes that M.R.Evid. 105 provides that "evidence inadmissible as to one defendant shall not be admitted as to other defendants unless all references to the defendant as to whom it is inadmissible have been effectively deleted." He argues, however, that the removal of Eastman's name distorted the meaning of his statements because the jury, hearing him implicate an unnamed "someone," would believe that he was holding

back evidence and would consequently question his credibility.

 Review of defendant's claim is for an abuse of discretion. *See United States v. Thuna*, 786 F.2d 437, 441 n. 7 (1st Cir.), cert. denied, 479 U.S. 825, ·107 S.Ct. 100, 93 L.Ed.2d 50 (1986). Under this standard, we will reverse the decision of the trial court only on a finding of clear prejudice. *State v. Smith*, 415 A.2d 553, 556 (Me.1980).

 Generally, when a confession is introduced, the defendant has the right to have all, and not just part of it, put in evidence. *See Wing*, 294 A.2d at 423. (citing *United States v. Kershner*, 432 F.2d 1066 (5th Cir. 1970)). When one defendant's confession is redacted to avoid implicating the other, however, the rule of completeness is violated only when admission of the statement in its edited form distorts the meaning of the statement or excludes information substantially exculpatory of the defendant. *Thuna*, 786 F.2d at 441. Although the redaction in this case may have caused the jury to question Craney's credibility, any error was harmless because there was little in his statement that was exculpatory and the other evidence against him, although circumstantial, was overwhelming.

*Improper Prosecutorial Comment*

 Defendants finally claim that the prosecutor made improper statements of personal opinion in closing. No objection was made at the trial, and therefore we review only for obvious error. Such an error must be so highly prejudicial and so taint the proceeding as to virtually deprive the defendant of a fair trial. *State v. Williams*, 653 A.2d 902, 908 (Me.1995).

We have held that a prosecutor is free to use "wit, satire, invective and imaginative illustration" in arguing the state's case. *State v. Weisbrode*, 653 A.2d 411, 416 (Me. 1995) (citation omitted). The record demonstrates that the two comments at issue here were anecdotes used by the prosecutor in an attempt to educate the jury regarding their proper role in assessing the evidence. Although unwise, neither anecdote represents obvious error. Finally, contrary to East-

man's assertion, evidence in the record is sufficient for the jury to have found every element of the crimes charged beyond a reasonable doubt, *see Williams*, 653 A.2d at 908, and defendants' remaining arguments are without merit.

The entry is:

Judgments affirmed.