UNITED STATES of America,
Appellee,

v.

James HOLLIDAY, Defendant,
Appellant.

No. 04–1372.

United States Court of Appeals,
First Circuit.

Heard Feb. 8, 2006.

Decided Aug. 2, 2006.

Janet H. Pumphrey for the defendant.

Virginia M. Vander Jagt, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for the United States.

Before SELYA, LYNCH, and LIPEZ, Circuit Judges.

LIPEZ, Circuit Judge.

A jury convicted the defendant of being a felon in possession of a handgun. 18 U.S.C. § 922(g)(1). The defendant came into possession of the gun during a physical confrontation with a police officer. The district court concluded that the defendant fell within the ambit of the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1), and imposed a sentence of 262 months, the low end of the applicable guideline range. The defendant now appeals both his conviction and his sentence, arguing that the district court erred in: admitting certain identification evidence; refusing to instruct the jury on the defendant's theory that he took the police officer's handgun in self-defense; applying the Armed Career Criminal Act even though the government had not supplied court records for one of the defendant's previous convictions; and concluding, for sentencing purposes, that the defendant had possessed the handgun in connection with a crime of violence. After a careful review of the record, we affirm the defendant's conviction and reject his allegations of sentencing error.

I.

Because the defendant's principal claim is that the district court failed to instruct the jury on self-defense, we review the facts relating to that theory in the light most favorable to the defendant. See United States v. Flores, 968 F.2d 1366, 1367–68 (1st Cir.1992). Although the defendant also raised a misidentification defense, he does not challenge on appeal the jury's rejection of that defense. For narrative convenience, we review the trial evidence relating to identification in the light most favorable to the verdict. See United States v. George, 448 F.3d 96, 97 (1st Cir. 2006). We draw the facts relevant to the defendant's challenge to the pretrial identification procedures from the district court's unchallenged factual findings at the motion to suppress. See United States v. Monteiro, 447 F.3d 39, 41 (1st Cir.2006).

We reserve, for the moment, the facts relevant to the sentencing.

At about 10:15 p.m. on a balmy July night, Boston Police officers John Lydstone and Terence Pennington observed the defendant and six other people—two women and four men—at a park in the Roxbury section of Boston. Several people in the group were drinking beer, but the defendant was not. (As it turned out, the defendant was in the park independently from the group of drinkers.) Because it was illegal to possess alcohol in a Boston city park, Lydstone and Pennington exited their patrol cruiser and told the drinkers to put their beers down. Everyone complied. Pennington asked the group if anyone had a weapon. When no one responded, he announced that he was going to "pat-frisk" everyone present. Pennington pat-frisked four of the men and then began pat-frisking the defendant. The defendant was "compliant," and Pennington later testified that he did not have any particular concern that the defendant possessed a weapon.

While Pennington was pat-frisking the defendant, Lydstone observed one of the women drop something behind a stone wall. He yelled for Pennington to "hold up a second." Pennington stopped pat-frisking the defendant before he had checked the defendant's waist area for contraband. Lydstone then handcuffed the woman and directed her to his cruiser. As this was happening, a man with a video camera entered the park and began filming the interaction between the police and the group of beer drinkers. Alarmed, Pennington told the man with the video camera to "shut the camera off," and that by videotaping the scene he ran the risk of being "hurt or shot." Lydstone approached the man with the camera and tussled with him briefly in an unsuccessful effort to take the camera. Lydstone then told the cameraman to wait with the group of beer drinkers.

Pennington decided to see what the now-detained woman had dropped behind the stone wall. He found a bag of marijuana and a medium-caliber revolver. Pennington yelled to Lydstone, "Gun, Gun, Gun," waved the weapon he had found in the air, and told everyone to "get on the ground." At about the same time, the defendant ran away from the other people in the park, down a slope, and towards some nearby woods.

Lydstone gave chase and caught the defendant "roughly two to three seconds" after he had run off. Lydstone grabbed the defendant's shirt and wrestled him to the ground. The two men rolled down the slope, and the defendant ended up on top of Lydstone. Lystone attempted to get the defendant off of him, and the two men fought. Lydstone tore the defendant's shirt, punched him in the face, and attempted to push him away. Despite these efforts, Lydstone did not gain control over the situation, and the defendant remained on top of him. Then, Lydstone testified, he saw "a shiny object" in the defendant's waistband. Lydstone "reached down and retrieved" his own handgun and placed his gun directly under the defendant's chin. His finger was not on the trigger, but the gun was positioned so that, if fired, it would send a bullet through the defendant's brain and out the back of his head.

The defendant shouted "No, No, No!" He grabbed for Lydstone's gun. After a struggle, the defendant seized the gun. He stood up and pointed the gun at Lydstone. Lydstone rose to his feet to run away from the defendant. As Lydstone was getting up, the defendant fired at least

one shot,[1] which did not cause any damage.[2] The defendant disappeared from the scene. The next day, a Connecticut Department of Transportation worker found Lydstone's handgun in the southbound breakdown lane of Interstate 95.

Officers Lydstone and Pennington described the defendant as an African–American man with dreadlocks and "burn marks" on his face. The police gathered information that appeared to implicate the defendant. They prepared an array of photographs. The district court later described the array as follows:

> [The defendant] has generally dark skin but a very noticeable patch of lighter skin in the areas of his chin, nose, and eyes.... [The police] produced a series of pictures in which all of the men are of similar build, four of the men are black with skin discoloration (though none of the four has the dramatic skin pattern that the defendant has) and the remaining four males have hairstyles similar to [the defendant's] dreadlocks. Although none of the men shown in the array are likely to be readily confused with [the defendant], they do resemble, to varying degrees, the description that Pennington and Lydstone gave before the array was assembled.

Lydstone and Pennington both identified the defendant with certainty. Roughly two weeks after the incident in the park, deputy U.S. Marshals arrested the defendant in Atlanta, Georgia. He returned to Boston, initially to face state assault charges. Later, the state charges were dismissed. The case was tried in federal court on the felon in possession charge alone.

The district court rebuffed the defendant's effort to suppress the officers' identification of him, reasoning that the photographic array had not been inappropriately suggestive. The case proceeded to trial. The defendant presented no witnesses. His principal theory of defense was misidentification—the police officers had described Lydstone's assailant as a man much larger than the defendant, and there were discrepancies in their versions of the facts.[3] The defendant also sought to show that he had acted in reasonable fear for his life in seizing Lydstone's gun. The district court refused, however, to instruct the jury on a self-defense or necessity theory. The court's reasoning, drawn from the pattern jury instructions for this circuit,[4] was that

---

1. There was conflicting testimony as to how many shots were fired. Lydstone said two; Pennington three; and the man with the video camera one. The police found three bullet casings in the park. The government also presented evidence suggesting that a bullet from Lydstone's gun had hit a park bench. The defendant contended that the evidence was insufficient to establish that the damage to the bench had been caused by Lydstone's gun. If the defendant actually did shoot Lydstone's gun towards the park bench, he shot the gun in the direction that Lydstone was fleeing.

2. At first, Lydstone asserted that he had been shot in the foot. He had complained of pain there, and there was a scuff mark on his boot. However, Lydstone later testified that he might simply have had his foot stepped on during the fight.

3. The man with the video camera also identified the defendant as the man who had run away from the scene in the park. He had not been exposed to a pre-trial photo array and testified that, while he did not know the defendant well, he recognized him in the park and at trial as a man he had seen around the neighborhood. The defendant sought to impeach this testimony on the ground that the witness had a history of heavy drug use and frequent incarceration, and on the ground that he was being held pending sentencing in an unrelated state case.

4. These instructions are not mandatory. See *United States v. Gomez*, 255 F.3d 31, 39 n. 7 (1st Cir.2001).

the defendant waived any justification defense by failing to provide evidence that "there was no [ ] alternative but to violate the law."

Despite the district court's refusal to give any justification instruction, the jury gave some indications that it was prepared to consider the defendant's proposed theory. During its first day of deliberations, the jury sent the court questions asking, "Willing possession, does it have anything to do with being threatened with death, self-defense, and an out-of-control officer?" and, "Do you have the right to touch a gun in self-defense if you are a convicted felon?" The district court responded by reminding the jurors of its definition of the felon in possession law and telling them that they should "avoid resorting to other sources of information you might have or ideas you might have about what the [legal] principles were." The next day, after several additional hours of deliberation, the jury returned a guilty verdict.

## II.

### A. The Motion to Suppress

■ The defendant contends that the photo array constructed by the police was "impermissibly suggestive," in violation of the Due Process Clause. *See Neil v. Biggers,* 409 U.S. 188, 196–98, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). He asserts that the district court should have suppressed Pennington and Lydstone's out-of-court identifications and barred them from identifying him in court.

■ We have said that identification evidence—identifications made before trial and in the courtroom—should be suppressed as a matter of due process "only in extraordinary cases." *United States v. Henderson,* 320 F.3d 92, 100 (1st Cir.2003). (Out-of-court identification evidence routinely is admitted in federal courts. *See*

Fed.R.Evid. 801(d)(1)(C).) When identification evidence is suppressed, it is "primarily to avoid an unfair trial." *United States v. Bouthot,* 878 F.2d 1506, 1516 (1st Cir.1989). An out-of-court identification based on a photo array must be suppressed as a matter of due process "only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Biggers,* 409 U.S. at 197, 93 S.Ct. 375. When the conviction is "based on eyewitness identification at trial following a pretrial identification by photograph," we will reverse on a constitutional basis only if the "very substantial likelihood of misidentification" was "irreparable," despite the defendant's opportunity to cross-examine the witness about the accuracy of the identification. *See Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

■ Both as to pretrial identifications and in-court identifications, our analysis takes two steps. We look first to see if there was anything impermissibly suggestive about the identification procedure and, second, if there was impermissible suggestiveness, "to decide whether the identification itself was reliable under the totality of the circumstances." *Henderson,* 320 F.3d at 100 (internal quotation marks omitted). "Our review of the district court's denial of [a] motion to suppress [a] photo identification is plenary." *United States v. Brennick,* 405 F.3d 96, 99 (1st Cir.2005).

The first prong of the test—whether the identification procedure was impermissibly suggestive—"can be broken down into two constituent parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures." 2 W. LeFave, Criminal Procedure 668, 2d. Ed. (1999). A photo array's suggestiveness normally is

evaluated by determining whether it "so far as practicable include[d] a reasonable number of persons similar to any person then suspected whose likeness is included in the array." Model Code of Pre–Arraignment Procedure, § 160.2(2) (1975). *See also United States v. Carter*, 410 F.3d 942, 948–49 (7th Cir.2005); *Brennick*, 405 F.3d at 99–100.

As the district court noted, constructing a fair photographic array that included the defendant posed an unusual challenge.

> [The defendant] was present at the hearing on the present motion, and I had the opportunity to observe his features. It is fair to say that he has a highly distinctive appearance. It is important to note that it is not just the fact of the skin discoloration, but its pattern, that is so distinctive. It can be said, as Lydstone remarked, that at first glance it appears [the defendant] is wearing a mask. He is, it must be acknowledged, highly recognizable.

In fact, the district court stated, the defendant's appearance was so unusual that "[i]t would be unreasonable to expect the police to find pictures of eight other men who not only shared his age, weight, hairstyle, and ethnicity, but in addition had a similar pattern of facial discoloration." As a result, there was "some truth to [the defendant's] argument" that "the photo array used with Officers Pennington and Lydstone was the equivalent of showing them a single photograph because [the defen-

dant's] appearance is so different from the other individuals shown in the array." Having reviewed the photo array, we agree with the district court that the defendant's facial pigmentation set him apart from the other men depicted in the array.

In the circumstances, however, a better photo array was not a "practicable" alternative. The police officer who constructed the photo array used a sophisticated database of 300,000 digital booking photographs. The database allowed him to search for photos of people with facial pigmentation. He performed at least a dozen searches for black men with facial pigmentation in constructing the photo array at issue here, steadily increasing his parameters for age, height, and weight, and removing any restriction as to hairstyle. Having found only four suitable photos, the officer filled in the remaining four spots in the array with men who had hairstyles similar to the defendant's. No other photo database was accessible to him. This was an unusual situation in which there may have been no way to construct a model photo array.[5] There was no error in the denial of the motion to suppress.

## B. Justification

The defendant and the government disagree about the availability of a justification defense in this case. To analyze this disagreement, we explain (1) some termi-

---

**5.** Other courts have concluded that the duty to match a suspect in a lineup or photo array with people who look similar may be limited in situations where the suspect's appearance is highly unusual. For instance, the Seventh Circuit has concluded that it may have been unreasonable to expect the police to fill a photographic array with people as large as a six and a half-foot, 350 pound suspect. *See United States v. Traeger*, 289 F.3d 461, 474 (7th Cir.2002). Nor were the police required to find photographs of people who, like a

suspect in another Seventh Circuit case, had a distinctive "notched eyebrow." *See United States v. Moore*, 115 F.3d 1348, 1360 (7th Cir.1997). The Wisconsin Supreme Court has provided a concise gloss: "The police authorities are required to make every effort reasonable under the circumstances to conduct a fair and balanced presentation of alternative possibilities for identification. The police are not required to search for identical twins...." *Wright v. State*, 46 Wis.2d 75, 175 N.W.2d 646, 652 (1970).

nology relevant to the defendant's theory; (2) that justification defenses may be available in a felon in possession prosecution; and (3) why the facts of this case did not entitle the defendant to a jury instruction on those defenses.

## 1. Terminology

At trial, the defendant asked that the court instruct the jury on "self-defense." The district court rephrased the issue as one of "necessity." In a sense, both views are correct. We agree with the defendant that self-defense seems the best term for his theory as to why he was justified in *taking* the gun from Lydstone. The defendant claims that he had to seize the gun (an act of force) to protect himself from Lydstone's purportedly unnecessary and unwarranted act of placing the gun against his head (an act of force). In other words, the defendant claims that he resorted to force against an assailant in order to avoid the imminent danger of his own death at the hands of that assailant, the classic scenario in a self-defense case. *See United States v. Bello,* 194 F.3d 18, 26 (1st Cir.1999) (discussing pattern jury instructions on self-defense); *see also Boget v. State,* 74 S.W.3d 23, 29 (Tex.Crim.App. 2002) (concluding that self-defense is not limited to "assaultive crimes"); *United States v. Panter,* 688 F.2d 268, 272 n. 7 (5th Cir.1982) (refusing to decide in a felon in possession case "whether the proper label for this defense is self-defense or necessity"); Model Penal Code § 3.04.

However, we also agree with the district court that the defendant would have had to show some legal justification for *keeping* the gun after he had seized it, under the rubric of a necessity or duress defense.[6] It was not error for the district court to focus on the requirements of such a defense in analyzing the defendant's arguments.

## 2. Availability of the Defenses

We have not decided whether a defendant charged with being a felon in possession of a handgun may assert as an affirmative defense that he was justified in his possession, though we appear to have assumed that such a defense is available. *See United States v. Diaz,* 285 F.3d 92, 97 (1st Cir.2002) (discussing, but not deciding, who bears the burden of persuasion in a justification defense to a felon in possession charge). The circuits that have decided the issue have unanimously allowed a justification defense to a section 922 charge. *See United States v. Bell,* 214 F.3d 1299, 1300 (11th Cir.2000); *United States v. Gomez,* 92 F.3d 770, 774–75 (9th Cir.1996); *United States v. Singleton,* 902 F.2d 471, 472 (6th Cir.1990) ("[C]ommon sense dictates that if a previously convicted felon is attacked by someone with a gun, the felon should not be found guilty for taking the gun away from the attacker in order to save his life."); *United States v. Paolello,* 951 F.2d 537 (3d Cir.1991); *Panter,* 688 F.2d at 268; *see also United States v. Perrin,* 45 F.3d 869, 875 (4th Cir.1995); *United States v. Vigil,* 743 F.2d

---

**6.** A "necessity" defense typically is invoked in an attempt to excuse otherwise illegal conduct undertaken in an emergency, classically an emergency caused by "the physical forces of nature (storms, privations) rather than from other human beings." 2 W. LaFave Substantive Criminal Law § 10.1(a) 2d ed. (2003) (hereinafter LaFave). Duress classically was the counterpart of necessity for acts forced by human beings. *Id.* We have said

that "[t]he traditionally separate defenses of necessity and duress have become increasingly blurred in modern decisions, to the point of merger." *United States v. Nelson–Rodriguez,* 319 F.3d 12, 40 n. 9 (1st Cir.2004). For another view, *see* Model Penal Code §§ 2.01, 2.09, 3.02 (categorizing duress as a limitation on the defendant's ability to act voluntarily and necessity as a justification defense).

751, 756 (10th Cir.1984). The defendant asks us to follow these cases. The government assumes their validity.

After oral argument in this case, the Supreme Court provided some additional guidance on justification-type defenses in section 922 cases. In *Dixon v. United States,* —— U.S. ——, 126 S.Ct. 2437, 165 L.Ed.2d 299 (2006), the Court considered whether the government or the defendant bears the burden of proof on a duress defense to a section 922 charge.[7] (The Court concluded that the defendant bears the burden.) While the Court did not explicitly evaluate whether duress and the common-law justification defenses are available in a section 922 case, the Court did say that "it would be unrealistic to read [the statute and its legislative history] as implicitly doing away with a defense as strongly rooted in history as the duress defense." *Id.* at 2445 n. 6. Nevertheless, the *Dixon* Court merely assumed arguendo that a defense of duress was available. *Id.* at 2445. We too will simply assume arguendo that Congress intended to allow the defenses of necessity, duress, and self defense in a section 922 prosecution. As we will explain, that assumption does not help the defendant.

### 3. No Basis for an Instruction Here

■ As we indicated above, to prevail on the theory that he terms self-defense, the defendant would have had to show legal justification *both* for his seizure of Lydstone's gun *and* for keeping the gun as long as he did.[8] This case does not re-quire us to decide whether the defendant could have asserted self-defense for taking Lydstone's gun. Because the defendant kept the firearm even after seizing it in the purported act of self-defense, we can focus, like the district court, on the defendant's lack of justification for his continued possession.

■ Rather than renouncing the gun as soon as any danger to his life had passed, the defendant kept and fired the gun. A necessity instruction is appropriate only where there is evidence sufficient to create a triable issue that a defendant "had no legal alternative but to violate the law." *United States v. Ayala,* 289 F.3d 16, 26 (1st Cir.2002) (internal quotation marks omitted); *see also Bello,* 194 F.3d at 27 (discussing basically identical requirement in a duress defense). The district court relied on this principle in concluding that the defendant was not entitled to a necessity defense. We agree with the district court's reasoning. The defendant had the obvious alternative of announcing to Lydstone upon taking the gun that he had no intention to use the weapon and wanted merely to end the altercation peacefully and turn himself in. In other words, the defendant had a better, legal alternative to continued possession of the gun and indisputably did not choose that alternative. Similarly, the defendant could not assert self-defense as a justification for his continued possession because he could not claim that after taking the gun he still "reasonably believe[d] that [force] [was] necessary for the defense of [himself]

7. *Dixon* concerned a prosecution under 18 U.S.C. § 922(n), which bars receipt or interstate transport of a firearm by a person under indictment for a felony. This case falls under subsection (g)(1) of the same statute, which bars possession, receipt, or interstate transport of a firearm by a convicted felon.

8. We acknowledge that several of our sister circuits have adopted a list of four elements required to make out a generic "justification" defense to a § 922 charge. *See, e.g., United States v. Gant,* 691 F.2d 1159, 1162–63 (5th Cir.1982); *Singleton,* 902 F.2d at 472–73. We prefer to resolve this case on the basis of principles from our own cases on necessity, duress, and self-defense.

against the immediate use of unlawful force." *Bello*, 194 F.3d at 26.[9] The defendant was not entitled to any justification instruction.[10]

## III.

At sentencing, which occurred before the United States Supreme Court decided *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the district court determined that the defendant's base offense level was 24 and that his criminal history normally would put him in category four. However, the district court also determined that the Armed Career Criminal Act applied.[11] *See* 18 U.S.C. § 924(e) (imposing a fifteen-year minimum prison term); U.S.S.G. § 4B1.4. Pursuant to the guidelines, the defendant's offense level then became either "34, if the defendant used or possessed the firearm [ ] in connection with [ ] a crime of violence, as defined in § 4B1.2(a) ... or 33, otherwise." U.S.S.G § 4B1.4(b)(3).

Application of the Armed Career Criminal Act also meant that if the court determined that "the defendant used or possessed the firearm [ ] in connection with [ ] a crime of violence," his criminal history category would be six rather than four. U.S.S.G § 4B1.4(c)(2). The district court concluded that the defendant had indeed possessed Lydstone's gun in connection with a violent crime. The defendant now challenges both the district court's decision to apply the Armed Career Criminal Act and its determination that his conduct at the park constituted a crime of violence.

### A. Basis for the 1979 Predicate Offense

The pre-sentence report disclosed that the defendant had several previous felony convictions. He challenged the report on the ground that the government had not presented court records for one of those previous convictions, which occurred in 1979. The district court rejected this contention, referring to the use of the same conviction in calculating a previous federal prison term for the defendant. As the district court stated:

> The information has been relied on once before in sentencing, and with nothing to indicate any infirmity in the information, I think it's reasonable to rely on the combination of our own probation report from twelve years ago as well as the [police] records [of the defendant's previous interactions with the criminal justice system].

The defendant now repeats the argument he made before the district court.

■ Whether or not the district court acted within its discretion in considering the police reports relating to the 1979 crime is immaterial here. *Cf. Shepard v. United States*, 544 U.S. 13, 26, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) (holding that a district court may not rely on police reports in making factual findings as to whether a defendant's previous guilty plea to violating a "nongeneric" burglary statute could be counted as a conviction subject to the Armed Career Criminal Act). The government presented uncontested evidence, through court records, that the

---

9. Self-defense requires that the defendant "reasonably believes that [force] is necessary for the defense of [himself] against the immediate use of unlawful force," and that the defendant uses "no more force than appear[ed] reasonably necessary in the circumstances." *Bello*, 194 F.3d at 26; First Circuit Pattern Jury Instructions § 5.04.

10. The fact that the jury submitted questions relating to self-defense does not change this analysis. *See Bello*, 194 F.3d at 27 n. 12 (discussing a similar contention).

11. The Act applies when a person convicted of being a felon in possession of a handgun "has three previous convictions ... for a violent felony." 18 U.S.C. § 924(e)(1).

defendant had been convicted of four other crimes that qualified him for conviction pursuant to the Armed Career Criminal Act. The defendant does not contend that he could have evaded the Act if his 1979 conviction were disregarded.

## B. A Crime of Violence

■ The defendant also argues that the district court erred in determining that he had seized Lydstone's gun "in connection with [ ] a crime of violence." Such a contention requires a two-step resolution. "First, the court must decide whether the predicate offense is a violent felony. Second, the court must consider whether the defendant used or possessed a firearm in connection with that violent predicate offense." *United States v. Gary,* 74 F.3d 304, 316 (1st Cir.1996). Here, the defendant contests only the first half of the test. His principal complaint is that it was unfair for the district court to determine that he had committed a "violent felony," when he was not charged with assaulting Lydstone.

That the underlying predicate offense was not charged is not determinative of this analysis. As one of our sister circuits has explained, "a defendant need not be charged with or convicted of an offense for [the "crime of violence" enhancement imposed in this case] to apply, so long as the defendant in fact committed the offense." *United States v. Pluta,* 144 F.3d 968, 977 (6th Cir.1998). Nor, even after *Booker,* must the facts underlying the enhancement be found by a jury. Under the advisory guidelines regime, the district court can use the preponderance of the evidence standard to determine whether an enhancement applies. *See United States v. De Los Santos,* 420 F.3d 10, 14 (1st Cir.2005).

The uncontested facts indicate that the defendant fought with an officer who was trying to arrest him, seized that officer's gun, and then fired at least one shot while the officer was fleeing. Based on the evidence introduced at trial, the district court reasonably could have found for sentencing purposes that the defendant fired three shots, in a city park, at a police officer who was running away from him with his back turned. This conduct constituted a crime of violence.

*Affirmed.*