# United States Court of Appeals
## For the First Circuit

No. 06-1007

UNITED STATES OF AMERICA,

Appellee,

v.

LEONARDO HILARIO-HILARIO,

Defendant, Appellant.

No. 06-1009

UNITED STATES OF AMERICA,

Appellee,

v.

KENNEDI MARTÍNEZ,

Defendant, Appellant.

No. 06-1010

UNITED STATES OF AMERICA,

Appellee,

v.

FERNANDO JOSÉ MILÁN,

Defendant, Appellant.

No. 06-1011

UNITED STATES OF AMERICA,

Appellee,

v.

DELGADINO PEGUERO,

Defendant, Appellant.
_____

No. 06-1013

UNITED STATES OF AMERICA,

Appellee,

v.

SANTIAGO RODRÍGUEZ,

Defendant, Appellant.
_____

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]
_____

Before
Boudin, Circuit Judge,
Selya, Senior Circuit Judge,
and Keenan,[*] Senior District Judge.
_____

Michael S. Corona-Muñoz, by appointment of the court, for appellant Kennedi Martínez.

Juan J. Hernández-López de Victoria, by appointment of the court, with whom Hernández López de Victoria, PSC was on brief for appellant Delgadino Peguero.

_____

[*]Of the Southern District of New York, sitting by designation.

Guillermo A. Macari-Grillo, by appointment of the court, for appellant Leonardo Hilario-Hilario.

Olga M. Shepard-De Mari, by appointment of the court, for appellant Fernando José Milán.

Eric M. Quetglas-Jordán, by appointment of the court, with whom Quetglas Law Offices was on brief for appellant Santiago Rodríguez.

Jacabed Rodríguez-Coss, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Chief, Appellate Division, were on brief for appellee.

June 20, 2008

**BOUDIN**, <u>Chief Judge</u>.  On December 3, 2004, a forty-foot-long wooden yawl carrying ninety-two aliens from the Dominican Republic capsized off the coast of Vega Alta, Puerto Rico, after a thirty-hour journey over rough seas from Cabeza del Toro, a beach in the Dominican Republic.  The U.S. Coast Guard and Puerto Rico authorities brought eighty-five of the passengers safely to shore; seven others were confirmed dead at the scene.

Based on identifications made by some of the passengers on the beach, five individuals--Leonardo Hilario-Hilario ("Hilario"), Kennedi Martinez ("Martinez"), Fernando Jose Milan ("Milan"), Delgadino Peguero ("Peguero"), and Santiago Rodriguez ("Rodriguez")--were separated out as those who had conducted the smuggling venture.  Although generally referred to by the government as "captains,"  Hilario turned out to be the man in charge and the others, although sometimes involved in piloting, were crew.

After further investigation, all five defendants were charged on May 17, 2005, in a second superseding indictment, alleging that

> aiding and abetting each other, [they] did, knowingly, willfully and intentionally, bring and attempt to bring to the United States, for private financial gain and profit, and by the use of an unseaworthy and overcrowded yawl which placed in jeopardy the lives of the aliens, approximately eighty-seven (87) aliens . . . .  This violation resulted in the death of [seven passengers]."

-4-

Fairly read, this formulation, although jumbled, charged each defendant with both the central offense of smuggling an alien into the United States or attempting to do so, 8 U.S.C. § 1324(a)(1)(A)(i) (2000), and the separately enumerated offense of aiding and abetting such an offense, id. § 1324(a)(1)(A)(v)(II). One who aids and abets is normally liable as a principal, 18 U.S.C. § 2 (2000), but the smuggling statute prescribes in certain cases a lower sentence for mere aiders and abettors. 8 U.S.C. § 1324(a)(1)(B).

The references in the indictment to financial gain, placing life in jeopardy or committing an offense resulting in death invoked provisions of the statute's sentencing regime. Each one of these characteristics raises the maximum sentence available. 8 U.S.C. §§ 1324(a)(1)(B)(i), (iii), (iv). Although pertinent only to sentencing, a jury determination typically is required to invoke the higher sentences under familiar precedent. Apprendi v. New Jersey, 530 U.S. 466 (2000).

A fifteen-day jury trial followed at which ten of the passengers testified. The government relied heavily on eyewitness testimony to establish that the five defendants operated the vessel. Several passengers testified that Milan, Peguero, and Rodriguez piloted the yawl at various points during the journey; Martinez was identified as having navigated and steered the vessel with the help of a GPS or similar device, and Hilario was described

as the "head captain" who gave orders to the others and maintained contact via cellular telephone with other organizers on land.

The government also presented evidence to show the unseaworthiness of the vessel. The passengers described the overcrowded, unsafe, and unsanitary conditions on the vessel. Three members of the Coast Guard, who had participated in the rescue efforts, described the conditions of the surf, the rudimentary construction of the yawl (which had fallen apart in the surf along the Vega Alta coast), and the vessel's lack of bathrooms, lights, seats, radio, or appropriate safety or navigational equipment.

All five defendants were convicted on the indictment count set forth above.[1] Pursuant to a special verdict, the jury found that all defendants acted for the purpose of financial gain, and all except Rodriguez placed the lives of the passengers in jeopardy and had participated in an offense resulting in the death of seven passengers. The district court later sentenced Hilario to 204 months in prison, Martinez and Peguero to 188 months, Milan to 176 months, and Rodriguez to 120 months.

All five now appeal their convictions and sentences, arguing that various decisions made by the district judge deprived them of a fair trial and that their sentences were improper. Some

---

[1]The indictment also included a separate count against Peguero for intimidating witnesses but the jury acquitted on this count and it is not at issue on appeal.

of these arguments are pressed by all five defendants while others are unique to particular defendants. We begin with the collective attacks and then turn to the individual ones. The standard of review varies with the issue.

All five defendants argue that pretrial identification, by means of the photograph line-up shown to the cooperating witnesses, was so suggestive that it fatally tainted the identification evidence at trial. The completed photo line-up contained fifty-eight color head shots of those taken from the waters alive, including all of the men; some of the women were included but others were left out after one of the prosecutors said that it was unnecessary to include the women.

The fifty-eight photographs were arranged nine per-page (leaving four for the last page) in the order in which the subjects were processed by immigration officials. Since the five defendants had been separated from the remaining detainees, they were photographed last and appear in the final five photographs in the set. This was shown to the passengers who were willing to identify the "captains." Thirty-seven passengers identified Hilario, forty identified Rodriguez, thirty-five identified Milan, twenty-seven identified Martinez, and nineteen identified Peguero.

At trial, the defendants sought to have the photo line-up suppressed and to prohibit in-court identification of the defendants as tainted. The district court denied the motion and

the government introduced the line-up and relied heavily at trial on in-court identification by the testifying passengers. Our review of the district court's denial of the motion to suppress the photo identification is plenary save that findings of fact are reviewed for clear error. United States v. Holliday, 457 F.3d 121, 125 (1st Cir. 2006), cert. denied, 127 S. Ct. 1317 (2007).

The defendants contend that the introduction of this identification evidence undermined their right to a fair trial. See Stovall v. Denno, 388 U.S. 293, 301-02 (1967). Of all their attacks on this piece of evidence, the strongest is that the defendants' pictures were grouped together as the last five shown; and four of the defendants appear in the only pictures on the final page of the line-up. Other criticisms can be dealt with more briefly.

The Supreme Court says that a court should first look to the procedure itself to determine whether it was impermissibly suggestive, United States v. Bouthout, 878 F.2d 1506, 1514 (1st Cir. 1989) (citing Simmons v. United States, 390 U.S. 377, 384 (1968)); if so, the court determines whether under the totality of the circumstances the suggestiveness is so pronounced that there is a serious likelihood of irreparable misidentification. Neil v. Biggers, 409 U.S. 188, 196-97 (1972).

Suggestiveness is a matter of degree. In principle, a grouping of the defendants together might suggest an association

among them; if one were recognized as culpable, this might heighten the chance that ones next to him might be so identified even if the witness were doubtful. Location at the end seems no more dangerous than at the beginning, and the grouping does not appear to be deliberate tampering; but we will assume, merely arguendo, that the line-up was suggestive.

Yet the risk of prejudice was minimal. This is not a case in which a marginal identification--e.g., by a witness who only glimpsed the perpetrator of a crime--may have been bolstered by suggestive identification procedures. See id. at 199-200. Here, the witnesses identifying the defendants had traveled with them for thirty hours at a close distance and without any attempt by any of the defendants to conceal their appearances during the trip.

Further, the photo array was shown to the passengers on the same day as their arrival in Puerto Rico while their memories of the trip were still fresh. And defense counsel were given ample time at trial to explore any defects in the identification procedure--including whether other individuals not pictured in the photo array were the true leaders of the smuggling venture--and to argue those defects to the jury in summation. The photo array did not create a serious risk of misidentification.

As for the other criticisms, we are unable to discern the "marked differences in skin color, clothing, and contrast of

-9-

coloring" that defendants claim rendered the line-up suggestive. While some of the photographs, as the district court pointed out, do "look more like mug shots," none of these depicts any of the defendants. Nor were the latter identifications tainted when the government at the beach--based on passenger identification-- conspicuously separated the defendants from the other passengers.

The defendants also object to the admission of certain testimony given by two Coast Guard officers involved in the rescue, Lieutenants Lahcen Armstrong and William Nunes. Armstrong testified extensively about the size and appearance of the yawl, the number of passengers, and sea conditions at the time. Over objection he was allowed to testify about what safety equipment such a vessel should have had (but here didn't) and the maximum number of passengers that could safely be carried.

Specifically, Armstrong said that such a vessel required "properly maintained engines . . . navigational lights and equipment . . . life preservers, for all the people on board, navigational charts and potentially GPS electronic devices, [and] VHS/FM radios" and that he "would expect a vessel that size to have no more than 20 to 30 people on board safely." Nunes stated that a vessel the size of the yawl could not sustain the swells and rough surf it encountered.

The objection, duly preserved, is that neither officer was specified as an expert in advance of trial, as is required by

governing rules. Fed. R. Crim. P. 16(a)(1)(G). The government argues that no notice was required because the lieutenants delivered only lay opinion testimony, which is not subject to Rule 16's disclosure requirements. The recurring problem is that "the same witness--for example, a law enforcement officer--may be qualified to 'provide both lay and expert testimony in a single case.'" United States v. Ayala-Pizarro, 407 F.3d 25, 28 (1st Cir.), cert. denied, 546 U.S. 902 (2005) (quoting Fed. R. Evid. 701, advisory committee's note).

There is no bright-line rule to separate lay opinion from expert witness testimony; circuits, and indeed decisions within a circuit, are often in some tension. But we think it is quite arguable, and proceed on that arguendo premise, that some of Armstrong's testimony as to specific necessary safety precautions and vessel capacity seems to be based on specialized knowledge and also to reflect the heightened sophistication normally associated with expert testimony.

But "[t]o succeed in obtaining a reversal on appeal, a defendant must prove both an abuse of discretion and prejudice." United States v. Alvarez, 987 F.2d 77, 85 (1st Cir.), cert. denied, 510 U.S. 849 (1993). Given the lack of any safety or fixed navigation equipment and the extraordinary overcrowding, the vessel was patently dangerous to life. Indeed, defense counsel objected to the introduction of testimony from other Coast Guard officers on

the ground that it was "irrelevant or cumulative" because "there [was] no issue that there were unsafe conditions on the boat."

The defendants do not complain that the witnesses were not formally qualified as experts, presumably because their qualifications were apparent. This does not automatically mitigate a Rule 16 violation if one occurred; the rule helps the opponent to develop cross examination and to retain a counter-expert. But on the present facts, the witnesses were quite unlikely to be impeached on their main points and defendants knew at the outset that unseaworthiness was a critical issue.

The defendants further assert that they are entitled to a new trial because the jury selection process did not adequately probe jurors' prejudices. They say that the district court erred in refusing to ask eighty proposed voir dire questions designed to uncover, among other things, potential jurors' biases concerning illegal immigrants, immigration in general, individuals hailing from the Dominican Republic, and prior exposure to the case through the media.

While the trial judge did not ask the precise questions requested, he conducted a thorough and searching voir dire, covering inter alia whether the jurors had pre-existing views of the defendants' guilt or innocence; whether they had learned anything about the case through any media; whether any jurors would be prejudiced by evidence of the seven deaths; and, importantly,

whether the jurors had feelings about Dominican nationals or illegal immigrants that would impair the ability to come to a fair, impartial, and just decision.

Nor did the district court err, as the defendants now argue, by failing to question all members of the venire individually. Individual questioning may sometimes be appropriate, but this decision, like most in the conduct of the voir dire, rests in the district court's sound judgment. United States v. Orlando-Figueroa, 229 F.3d 33, 43 (1st Cir. 2000). Defendants are also far from showing that they were prejudiced by the district court's handling of the venire. See United States v. Misla-Aldarondo, 478 F.3d 52, 60-61 (1st Cir.), cert. denied, 128 S. Ct. 132 (2007).

Next, defendants assail the district court's refusal to enjoin the government from speaking to the press. At trial, Martinez and Hilario filed separate motions seeking a court order to enjoin the prosecution from making further statements to the press; both motions referred to an article published by the San Juan Star on May 9, 2005, in which the government confirmed the date of the upcoming trial and the penalties the government was seeking.

In subsequent motions the parties disputed whether other statements in the article--including the claim that "dozens of survivors identified the accused as the organizers of the ill-fated crossing"--were properly attributed to the government in violation

-13-

of local rules prohibiting prosecutors from publicly commenting on the evidence presented at trial. We found no recorded ruling by the court; conceivably, the matter was dealt with in chambers or simply dropped.

In all events, while defendants refer to the "unprecedented media coverage" following the rescue and call the publicity "inflammatory," they do not show that the government was responsible for anything beyond a description of the trial date and penalties sought. Under these circumstances, we see no basis for saying that the failure to issue the requested injunction resulted in harmful publicity or otherwise prejudiced the defendants.

We turn now to the objections made by individual defendants, starting with Milan's claim that his fifth and sixth amendment rights were violated by the admission of statements he made to federal agents who interrogated him after his arrest. Milan was interviewed after his arrest by federal agents in the early morning hours of December 4, 2004, and again interrogated by two agents and two prosecutors on the afternoon of December 5, 2004. In each case he was given <u>Miranda</u> warnings and signed waiver forms.

During these interviews, Milan admitted to being involved in the smuggling venture and confirmed that he had, at times, piloted the vessel. He gave other details about the trip and identified from a photo spread the pictures of the other

-14-

individuals involved and specified those who had controlled the engines. At trial, the district judge allowed the statements to be used against Milan, redacting references to other defendants to comply with Bruton v. United States, 391 U.S. 123 (1968). See Richardson v. Marsh, 481 U.S. 200, 211 (1987).

Milan says that the second interrogation occurred after a criminal complaint and an arrest warrant had been filed on December 4, 2004, so it was improper not only under Miranda but because the questioning occurred in the absence of counsel after adversarial proceedings had commenced. But whether or not a criminal complaint begins adversarial proceedings triggering a right to counsel, cf. Brewer v. Williams, 430 U.S. 387 (1977), a defendant can still waive that right. Patterson v. Illinois, 487 U.S. 285, 290-91 (1988).

As for Milan's claim that both interviews were unlawful because his Miranda waivers were not knowing and intelligent, the district judge held a hearing, heard from three of the agents, and considered a proffer from Milan. Milan cited his limited education, experience with police in his own country and the trauma of the boat foundering; the agents described Milan's calm demeanor, lack of handcuffing and the agents' conduct during the interviews. The judge concluded that the waivers were valid.

"The voluntariness of a waiver . . . has always depended on the absence of police overreaching, not on 'free choice' in any

-15-

broader sense of the word." Colorado v. Connelly, 479 U.S. 157, 170 (1986). The district court's ruling rested on a factual evaluation of what had occurred and the application of a general standard to the particular facts found. The district court's evaluation is reasonable, is reviewed with deference, United States v. Downs-Moses, 329 F.3d 253, 267 (1st Cir.), cert. denied sub nom. Ward-O'Neill v. United States, 540 U.S. 916 (2003), and must be sustained here.

Milan also says that the redacting of his references to co-defendants unfairly exaggerated his own role. Redaction is a judgment call, primarily within the discretion of the trial judge, United States v. Thuna, 786 F.2d 437, 441 n.7 (1st Cir.), cert. denied, 479 U.S. 825 (1986), and the standard is not friendly to the dissatisfied party. United States v. Simonelli, 237 F.3d 19, 28 (1st Cir.), cert. denied, 534 U.S. 821 (2001). Other trial testimony amply established the involvement of other defendants, and the redaction was not an abuse of discretion.

Nor did the court violate Milan's right to confront witnesses against him when he was not allowed to question the agents to bring out his own admissions implicating other defendants. "Since the deletion of the [redacted testimony] was not prejudicial . . . it was within the district court's discretion to so limit cross-examination, and no independent sixth amendment issue is raised." Thuna, 786 F.2d at 442 n.10. The agents, of

course, had no first hand knowledge of the relevant events and Milan was himself free to testify first hand about the involvement of others if he chose.

Martinez says that the district court should have granted his motions for acquittal and for a new trial. Martinez says that based on the evidence he was no more than a passenger on the yawl and did not participate in the smuggling venture. On this claim, we view the evidence in the government's favor and affirm the conviction if a rational jury could conclude that the prosecution proved all elements of the offense beyond a reasonable doubt. United States v. Beltran, 503 F.3d 1, 2 (1st Cir. 2007).

At trial, nine of the ten witnesses testified against Martinez, saying (for example) that he assisted with the navigation of the vessel and received payment from one of the passengers. (In fact, Martinez was identified by many more but the judge limited witness testimony as cumulative.) The motion to acquit was properly denied and the denial of a new trial was not an abuse of discretion.

Hilario claims that the government tainted his conviction by intimating, in its closing statement, that Hilario refused to bring the yawl ashore because he had not yet confirmed that each passenger had a friend or family member waiting on land to pay the trip organizers. The prosecutor claimed "that profit, that profit that they were going to make off this trip was why defendant

Leonardo Hilario-Hilario would not allow that yawl to come to land until contact was made with the people on land."

There was evidence that travelers were to be held ashore until further payments were made and that Hilario was heard discussing the matter on a cellular telephone. Possibly the prosecutor's inference was a step beyond what was proved; but there was no contemporaneous objection, meaning that review is for plain error only. United States v. Allen, 469 F.3d 11, 16 (1st Cir. 2006), cert. denied, 128 S. Ct. 41 (2007). We have no reason to think that this single comment altered the outcome.

This brings us to the defendants' attacks on their sentences. By far the most important is one advanced by Rodriguez, namely, that his ten-year sentence exceeds the maximum allowed under the statute; he asks that we remand his case to the district court for re-sentencing subject to a statutory maximum of only five years. Statutory context is required to grasp his argument.

The governing statute, 8 U.S.C. § 1324, defines prohibited conduct as, among other things, knowingly "bring[ing] to or attempt[ing] to bring to the United States [an alien] at a place other than a designated port of entry," id. § 1324(a)(1)(A)(i), or aiding and abetting the commission of prohibited acts, id. § 1324(a)(1)(A)(v)(II). Subsection (a)(1)(B) provides the pertinent maximum sentences, which vary based on the circumstances surrounding the crime's commission.

-18-

Importantly, a defendant convicted of smuggling an alien is subject to a ten-year maximum, id. § 1324(a)(1)(B)(i), but--quite unusually--one convicted solely of aiding or abetting can be imprisoned for no more than five years, id. § 1324(a)(1)(B)(ii).[2] Stiffer maximums are provided for jeopardizing the life of another or causing serious bodily injury (twenty-year maximum) or for committing an offense resulting in death (maximum of life imprisonment). Id. §§ 1324(a)(1)(B)(iii), (iv).

The indictment (quoted above) charged the five defendants in a single count with violating section 1324(a)(1)(A)(i)'s prohibition on the smuggling of aliens as well as section 1324(a)(1)(A)(v)(II)'s aiding and abetting prohibition; it further alleged that the defendants had acted for purposes of financial gain and that the smuggling venture had jeopardized the lives of the passengers, resulting in the death of seven of them, triggering enhanced penalties under sections 1324(a)(1)(B)(iii) and (iv).

The district court gave instructions to the jury covering both smuggling and aiding and abetting that offense, and asked whether each defendant was guilty or not guilty "[a]s to count one of the indictment." It also gave the jury special verdict

---

[2]The ordinary rule, in the absence of such a distinction in the substantive statute, is that an aider and abettor is treated as a principal, 18 U.S.C. § 2, and is punishable accordingly. See United States v. Bryan, 483 F.2d 88, 95 (3d Cir. 1973) ("[A]n aider and abettor is a principal and can be punished as such.") (internal quotation omitted). Normally only an accessory after the fact gets a fifty percent discount on the maximum sentence. 18 U.S.C. § 3.

questions directed to financial gain, jeopardizing the lives of passengers, and death; but, probably because such a distinction ordinarily does not matter (see note 2, above), it did not ask the jury to determine whether each defendant was guilty of smuggling or merely aiding and abetting.

As to the defendants other than Rodriguez, this makes no difference because the jury's special verdict determined that each had jeopardized the lives of others and that death had resulted, triggering imprisonment for "any term of years or for life . . . ." Id. §§ 1324(a)(1)(B)(iii), (iv). But no such jury finding was made against Rodriguez; and, if only an aider and abettor, his maximum term should be five years. Compare id. § 1324(a)(1)(B)(i) with (ii).

Rodriguez did not raise this issue at sentencing but raises it now on appeal, so our review is only for plain error and we may reverse only if we conclude that the error was plain and prejudicial, and (if uncorrected) would cause a miscarriage of justice. United States v. Olano, 507 U.S. 725, 734 (1993). Facts raising the statutory maximum penalty must be found by a jury, Jones v. United States, 526 U.S. 227, 232 (1999), and here we cannot tell from the jury verdict that Rodriguez was convicted of smuggling (rather than aiding and abetting).

So the ten-year sentence was error and prejudicial but was it a miscarriage of justice? Ordinarily, we will treat a

-20-

sentence that nakedly exceeds the statutory maximum as plain error;[3] but that assumes that the defendant could not lawfully have been given that sentence. Here, Rodriguez could have been given that sentence if the evidence allowed him to be convicted as a principal and the jury so found. It might be enough to negate miscarriage if the evidence were compelling and the jury likely so found. See United States v. Portes, 505 F.3d 21, 26 (1st Cir.), cert. denied, 128 S. Ct. 730 (2007).

The jury did have enough evidence to convict Rodriguez as a principal. Anyone who helped operate the ship could technically be treated as a principal and there was testimony--albeit contradicted by another witness--that Rodriguez helped pilot the vessel. And (as we will see) the evidence would also have permitted the jury to conclude, as did the trial judge, that Rodriguez brandished a knife; but again the evidence was mixed and the jury may well not have viewed it as did the trial judge.

In all events Rodriguez was not in charge--the defendant most like a captain was Hilario--and, in a group enterprise, a jury could choose to regard someone whose role seemed to it less culpable as merely an aider and abettor. Here, for whatever

---

[3]E.g., United States v. Rodriguez, ____ F.3d ____, 2008 WL 2025066, at *19 (1st Cir. 2008); United States v. Rodriguez, 938 F.2d 319, 322 n.4 (1st Cir. 1991). Compare United States v. Portes, 505 F.3d 21, 26 (1st Cir.), cert. denied, 128 S. Ct. 730 (2007) (increase of a statutory maximum based on drug quantity issue not submitted to the jury not reversible for plain error where evidence of drug quantity was overwhelming).

reason, the jury assigned Rodriguez a lesser role than the other defendants since it found him alone not responsible for endangering the passengers or culpable for the deaths. So we have no reason to think it convicted him of the substantive offense of smuggling.

The government, which could have asked for a special verdict to establish that each defendant was a smuggler and not merely an aider and abettor, simply says that the evidence was sufficient for the former designation. This does not show that the jury convicted Rodriguez as a smuggler, or inevitably would have convicted him on this basis if it had been asked to choose. Nor does the government offer any alternative to Rodriguez' proposed remedy, namely, a remand for re-sentencing him within the five-year maximum.

The government does not argue that the district judge could now substitute his own determination for one that the Supreme Court has said must be made by the jury. Jones, 526 U.S. at 251-52. Nor, given double jeopardy principles, is it clear that the penalty issue could now be re-submitted to a new jury. But see United States v. Williams, 449 F.3d 635, 646 (5th Cir. 2006). Absent any alternative suggestion from the government, the straightforward course is to remand for re-sentencing Rodriguez within the statutory maximum of five years in prison.

In computing Rodriguez' guideline range, the district judge imposed on him a four-level upward adjustment for brandishing

a dangerous weapon. U.S.S.G. § 2L1.1(a)(4)(B) (2004). Rodriguez claims that he used what he calls a "kitchen knife," and the government calls a machete, merely to cut salami to distribute to the passengers during the trip. But the district court found that the knife was brandished and there is evidence to support this view.

One witness claimed that Rodriguez first used the knife only to cut salami, but later wielded the knife during a confrontation, telling passengers to "get down if you don't want us to cut your neck;" a second said that Rodriguez "pressured" the passengers to remain calm by "carrying a machete in his hand" in an aggressive manner. A third witness said that Rodriguez used the knife only to cut salami--but conceded that "there was one time he was speaking to the people telling them to relax with that knife in his hands."

The conduct described by the first two witnesses amounts to "brandishing" under the definition that "all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person," U.S.S.G. § 1B1.1, cmt. n.1(c); see United States v. LaFortune, 192 F.3d 157, 161-62 (1st Cir. 1999), cert. denied, 528 U.S. 1129 (2000). To overturn the finding would require a showing of clear error by the sentencing judge, United States v. Thongsophaporn, 503

-23-

F.3d 51, 57-58 (1st Cir. 2007), cert. denied, 128 S. Ct. 1294 (2008), so we sustain the adjustment as to Rodriguez.

This may not matter as to Rodriguez given the five-year maximum. But it does matter to the other defendants to whom Rodriguez' use of the knife was attributed based on guideline rules applicable to "jointly undertaken criminal activity" that is "reasonably foreseeable" to other actors. U.S.S.G. § 1B1.3(a)(1)(B). That the group was engaged in "jointly undertaken criminal activity" is obvious; the harder question is whether the use of the knife in aid of the endeavor was "reasonably foreseeable" to the other defendants.

The defendants say that the knife was brought on board innocently and that smuggling of illegal aliens does not normally involve coercion or violence. But the knife was still a weapon and, in this operation, the passengers were not to be released until additional sums were paid to the organizers upon their arrival--resistance being a real possibility in such a situation. Under these circumstances we cannot say that it was clear error to find that misuse of the knife was reasonably foreseeable. See United States v. Santiago, 2006 WL 2946882, at *4 (11th Cir. 2006) (unpublished decision).

Hilario argues for himself that the district court improperly applied a three-level increase to his offense level based on his role as a "manager or supervisor" of the smuggling

-24-

operation. Such an enhancement is appropriate "if there is evidence that a defendant, in committing the crime, exercised control over, or was otherwise responsible for overseeing the activities of, at least one other person." United States v. Voccola, 99 F.3d 37, 44 (1st Cir. 1996) (quoting United States v. Savoie, 985 F.2d 612, 616 (1st Cir. 1993)).

Hilario used a cellular phone and was overheard discussing logistics of the operation with another participant; he was also identified as the captain who gave instructions to other participants and determined whether and when the boat would be brought to shore. The district court was entitled to impose the upward adjustment based on this evidence.[4]

The same is not so easily said about the two-level "special skill" adjustment imposed on all defendants save Hilario. U.S.S.G. § 3B1.3 (permitting for an adjustment where the defendant "used a special skill[] in a manner that significantly facilitated the commission or concealment of the offense"). Peguero, Milan and Rodriguez dispute the district court's conclusion that each of them possessed a special skill within the meaning of the guidelines. We review this claim more closely, United States v. Noah, 130 F.3d

---

[4]Hilario's argument that other defendants--namely, Martinez and Milan--were the true managers of the affair is beside the point, since the managerial role enhancement does not require the defendant to "be at the top of a criminal scheme." United States v. Goldberg, 105 F.3d 770, 777 (1st Cir. 1997).

490, 499 (1st Cir. 1997), because it turns less on fact finding and more on what the guideline means by "special skill."

The guidelines define a special skill as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." U.S.S.G. § 3B1.3, cmt. n.3 (providing as examples the skills possessed by "pilots, lawyers, doctors, accountants, chemists, and demolition experts"). The government argued at sentencing "that to pilot a vessel . . . on rough seas, high waves, traveling for at least 30 hours from the Dominican Republic towards Puerto Rico" necessarily demonstrated use of a special skill.

The district court did not specify its basis for pinning the label to the four defendants. No one other than Martinez (who, perhaps wisely, does not contest the adjustment as applied to him) was observed using a GPS or any other navigational device requiring some degree of sophisticated knowledge. So far as we can determine from the evidence, the others who received the adjustment merely took the helm at points during the voyage. The vessel, as the government pointed out, had none of the standard navigation or safety equipment that would ordinarily be used for a lengthy sea voyage.

Captaining a vessel fully equipped for the high seas doubtless requires special skills, see United States v. Montero-Montero, 370 F.3d 121, 123-24 (1st Cir. 2004), and certain

-26-

seafaring skills would doubtless qualify (e.g., navigation, communications, engineering).  But steering a simple sailing vessel along a course, as directed by another, does not appear to us to be a special skill and the district judge did not say that the three defendants did any more than this or had the training or expertise to do more.

Rodriguez is described in the pre-sentence report as a "lifetime construction worker" with "no other employment history"; Peguero, as a construction worker and a farm worker (the government conceded that Peguero was not "trained in any matters of the sea").  Milan's pre-sentence report alone contains a reference to his background as a fisherman in the Dominican Republic but this bare statement could cover anything from a rowboat to serious sailing; and some of what he did seemingly involved capturing small crabs at the beach.

The government points to no evidence that Rodriguez or Peguero had any sailing or navigational experience or that Milan, even if he had specialized experience, used it here.  Although the term "yawl" was used at trial, the vessel used here appears to have been little more than a wooden hull with two outboard motors affixed.  The level of skill required to steer such a vessel under the direction of a man with a GPS can hardly be compared even to that needed to keep a sailboat on course.  On this record the special skills adjustment cannot stand, accord United States v.

-27-

Batista De La Cruz, 460 F.3d 466, 469 (3d Cir. 2006), and new sentences are required with the adjustment deleted.

Our decision has addressed the defendants' colorable claims; other claims have been considered but require no discussion. We commend the skillful work of the district judge in this complicated trial; given the number of defendants and the variety of issues presented, it is a credit to him that there remain only a few loose ends as to three sentences that can be readily resolved on remand.

The convictions of all five defendants are affirmed, as are the sentences imposed on Hilario and Martinez. The sentences of the other three defendants (Rodriguez, Milan and Peguero) are vacated and their cases are remanded for re-sentencing in accordance with this decision.

It is so ordered.